**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

04 SEP 24 PM 1:48

U.S. [ ] [ ]
N.D. [ ] [ ]

| | | |
|---|---|---|
| JACQUELINE D. COLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CV 03-B-1529-S |
| | ) | |
| HEALTHSOUTH CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTERED**

SEP 24 2004

### MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Complete or Partial Summary Judgment, (doc. 17),[1] and plaintiff's Motion to Strike, (doc. 20). Plaintiff Jacqueline Cole has sued her former employer, defendant HealthSouth Corporation, alleging that defendant terminated her in violation of the Family and Medical Leave Act ["FMLA"]. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Complete or Partial Summary Judgment, (doc. 17), is due to be granted, and plaintiff's Motion to Strike, (doc. 20), is due to be denied in part and granted in part.

### MOTION TO STRIKE

Plaintiff has moved to strike the declarations of defendant's counsel, Stephen Brown and Michelle Clemon, pursuant to the Alabama Rules of Professional Conduct, R. 3.7(a), and

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.



paragraph 16 of Louise Dailey's declaration, which plaintiff contends is "inconsistent with her deposition testimony." (Doc. 20 at 2.)

Plaintiff's Motion to Strike the declarations of defendant's counsel will be granted. The court has not considered the testimony of Brown and Clemon in deciding defendant's Motion for Summary Judgment. However, plaintiff's Motion to Strike will be denied as to paragraph 16 of Dailey's declaration.

According to the deposition transcript, Dailey testified as follows:

> Q. Was any part of Jackie's termination based on the fact that she was fixing to have to be off?
>
> A. Yeah.
>
> Q. And, therefore, she would get further behind or make mistakes?
>
> A. Not at all.
>
> Q. Was that ever a concern with anybody?
>
> A. No.

(Doc. 18, Ex. 2 at 131.)  However, in paragraph 16 of her declaration, she testified:

> I have had an opportunity to review the transcript of my deposition testimony. On page 131 of the transcript, it states that I responded "Yeah" to the question: "Was any part of Jackie's termination based on the fact that she was fixing to be off?"  My response of "Yeah" was not intended to be an affirmative response to Mr. Arendall's question. *I said "Yeah" because I was under the impression that Mr. Arendall was in the middle of a question and I was acknowledging the first part of the question and anticipating the second part.*  It is my understanding that the audio tape of the deposition will confirm this.  Ms. Cole's termination was in no way associated with her request for medical leave. The fact that Ms. Cole needed to be off work for some period of time beginning February 4 played no part whatsoever in her

2

termination.  Rather, the sole reason for her termination was her continuing performance deficiencies.

(Doc. 18, Ex. 4 ¶ 16 (emphasis added).)

Plaintiff asks the court to strike paragraph 16 of Dailey's Declaration because it "is directly opposite to that contained in the deposition transcript," and "'the court should rely on [the] deposition testimony.'" (Doc. 20 at 2 (quoting *Van T. Junkins & Assocs. v. U.S. Indus.*, 736 F.2d 656 (11th Cir. 1984).)  However, Dailey's deposition testimony does not "conflict" with her declaration; her declaration only explains her deposition testimony as it appears in the transcript.

Defendant has submitted an audio tape of Dailey's deposition testimony.  The court has reviewed this audio tape and finds that Dailey's declaration is an accurate description of her deposition testimony.  On the tape, plaintiff's counsel's clearly asks Dailey, in the form of a single question, "Was any part of Jackie's termination based on the fact that she was fixing to have to be off, and, therefore, she would get further behind or make mistakes?" (*See* doc. 18, Ex. 8 [Audio Tape].)  Her answer to this question, "Not at all," (*id.*, Ex. 2 at 131), is in conformity with her deposition testimony as a whole that the decision to terminate plaintiff was made before plaintiff informed Dailey of her need for medical leave beginning February 4, 2003, (*see, e.g.*, doc. 18, Ex. 2 at 10, 36-38, 106, 121-22).

Because it is clear from the audio tape that the transcript of the deposition does not precisely reflect Dailey's actual testimony – due to the lack of any indication that Dailey uttered the word "yeah" ***during*** plaintiff's counsel's question, and not as an answer to half

3

his question, the court will consider the audio tape as accurate evidence of Dailey's actual deposition testimony. When the audio tape and paragraph 16 of Dailey's declaration are compared, there is no conflict. Therefore, plaintiff's Motion to Strike paragraph 16 of Dailey's declaration will be denied.

## MOTION FOR SUMMARY JUDGMENT

### I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the

non-moving party is to be believed and all justifiable inferences are to be drawn in her favor.

*See id.* at 255.  Nevertheless, the non-moving party need not be given the benefit of every

inference but only of every *reasonable* inference.  *See Brown v. City of Clewiston*, 848 F.2d

1534, 1540 n.12 (11th Cir. 1988).

## II. <u>STATEMENT OF FACTS</u>

Defendant hired plaintiff in October 2001.  (Doc. 18, Ex. 1 at 26.)  She worked in the

diagnostic billing section at defendant's Diagnostic Regional Business Office in Pelham,

Alabama, processing bills for defendant's diagnostic facilities.  (*Id.* at 46, 60-61; *id.*, Ex. 2

at 9-10.)  At all times pertinent to the instant action, Louise Dailey, Billing Department

Manager, was the supervisor of the diagnostic billing group, and Stephanie Branham,

Regional Business Office Manager, was Dailey's supervisor.  (*Id.*, Ex. 1 at 99; *id.*, Ex. 2 at

8, 9; *id.*, Ex. 3 at 7.)

Plaintiff's job duties consisted of "processing the claims for diagnostic services,"

including x-rays and MRIs, performed at defendant's diagnostic facilities.  (*Id.*, Ex. 1 at 61-

62.)  She testified that she would print out the claims to be processed that day; process the

claims, which included ensuring that all the necessary information was included and correct;

and submit the claims to whomever was responsible for paying for the diagnostic service.

(*Id.* at 64-66, 71-72.)  Dailey described plaintiff's responsibilities as follows:

> As a diagnostic biller, [plaintiff] was responsible for processing each
> paper claim, attaching any necessary documentation (such as doctor referrals)
> to the claim, assuring that each claim met the specifications of the entity to
> which it was being sent and sending out the claim.  For those claims that had
> insufficient or incorrect information, [plaintiff] was responsible for creating a

> weekly "dirty" report that reflected the deficiencies on any given claim. [Plaintiff] was also responsible for generating daily productivity reports that reflected what the billers had worked on.

(*Id.*, Ex. 4 ¶ 4.)

As part of its agreement with certain payers, defendant submitted claims to these payers according to their specifications. (*Id.*, Ex. 1 at 53-54; *see, e.g.*, *id.*, Ex. 3 at 27 ("[The] claims, due to our contractual arrangement, have to be put on a spreadsheet and sent out. That's the only way that we can get payment.").) Plaintiff sent some of these claims, the ones referred to by plaintiff as "direct bills," to another department after she proofed and processed them; these claims were not mailed by plaintiff. (*Id.*, Ex. 1 at 162-63; *see id.*, Ex. 3 at 23.) One of the "direct bill" payers was the Tuscaloosa VA. (*Id.*, Ex. 1 at 162; *see also id.*, Ex. 2, ex. 16 at HS000057, HS000078.)

On May 7, 2002, plaintiff was placed on a 90-day probation; the Employee Conference Report, prepared at that time, stated:

> Jacqueline Cole is receiving many personal phone calls and using her cell phone. She has also shown a decrease in her productivity and its accuracy. Claims are not going out daily, incorrect information is being put on the claims and claims are not going out correctly.

(*Id.*, Ex. 1, ex. 5.) At the end of the 90-day probation, the probationary period was not extended. (Doc. 21, Ex. 1 ¶ 10.) With the successful completion of the probation period, the threat of termination was inapplicable. (*Id.* ¶ 12.)

Sometime in December 2002, Dailey met with plaintiff and Brenda Smith, Billing Coordinator. (Doc. 18, Ex. 1 at 142-43; *id.*, Ex. 2 at 20.) Plaintiff was behind in her work.

(*Id.*, Ex. 1 at 143.) She had a stack of unprocessed claims that totaled approximately $382,000. (*Id.* at 146; *id.*, Ex. 4 ¶ 6.) Plaintiff and Smith were counseled regarding plaintiff's performance problems. (*Id.*, Ex. 2 at 84, 88, and ex. 11; *id.*, Ex. 3 at 17-18.) Dailey consulted Branham, and they discussed terminating or otherwise disciplining plaintiff. (*Id.*, Ex. 5 ¶ 4.) Branham told plaintiff and Smith --

> . . . they were to get all the claims cleaned up and out the door by the next day and to let [her] know if they had any holdups with the facilities. [Branham] also told both of them . . . that if anything like [that] ever happened again, it could be grounds for termination.

(*Id.*, Ex. 3 at 18.)

Plaintiff testified that after this meeting and verbal warning, she had no further problems processing claims accurately and in a timely manner. (*Id.*, Ex. 1 at 160.) However, defendant has presented evidence that the following month, January 2003, it discovered that plaintiff had mailed a large number of claims to the Tuscaloosa VA payer instead of sending them to the proper department for further processing. (*See id.*, Ex. 2, ex. 16 at HS000057, HS000078.)

On January 22, 2003, Dailey learned that a number of claims had been returned because plaintiff had not properly handled the claims. (*Id.*, Ex. 2 at 95-97 and ex. 16 at HS000057.) Dailey's notes regarding this incident state:

> Debra Pettinato[2] gave me the attached claims – they had been given to Debra's staff that handles direct bills.

---

[2]Debra Pettinato was the Coordinator for the department that was responsible for direct billing. (Doc. 18, Ex. 1 at 165; *id.*, Ex. 2 at 95.)

I've gone over [with] Jackie on Tusc[aloosa] issues 2 other times. But this leads me to believe she[']s still not taking care of details. Other problems that are happening – claims aren[']t being sent out timely [and] with all the required attachments. . . .

I will address these issues when she comes back to work [January 24, 2003.][3]

(*Id.*, Ex. 2, ex. 16 at HS 000057 (footnotes added).)

However, plaintiff did not go to work on January 24, 2003. (*See id.*, Ex. 1, ex. 7.) On that day, plaintiff went to the emergency room complaining of a sore throat. (*Id.*, Ex. 1 at 169-70.) Plaintiff testified as follows:

> Q. It says here on January 24th you were off of work because you had–
>
> A. Strep throat.
>
> Q. –strep throat; right?
>
> A. Yes.
>
> Q. And let me show you Exhibit 7, which is the HealthSouth call-in sheet for the regional business office dated January 24, '03. It looks like it's signed by a Lisa someone, whoever took the call. Look and see if that call-in sheet and what's on it is consistent with your reporting off on January 24th.
>
> A. (Witness complies). Yes.
>
> Q. And that was the day – I assume you got up on the morning of January 24 and had a terrible sore throat?
>
> A. Well, it was like early that morning, because I was scheduled to be off that Thursday, I was off, and we went on a field trip with my baby's school. And when I came home, my throat was hurting.
>
> Q. So you started noticing it the night before?

_____

[3]Plaintiff was absent on Thursday, January 23, 2003. (Doc. 18, Ex. 1 at 169.)

A. (Witness nodding head).

Q. So you had been off on Thursday, and January 24th was Friday?

A. Yes. I went in the emergency room that morning maybe about 3:30 or 4:00 that morning.

Q. So at the time you called in you had already been to the emergency room and you knew you had strep?

A. Yes.

. . .

Q. And then you thought you would be back at work on Monday, but you were still under the weather on Monday?

A. Yes.

Q. Let me show you Exhibit 9, which is your call-in sheet for that day. Is what's on that sheet consistent with your report off for that Monday, the 27th?

A. Yes.

(*Id.* at 168-71.)

The doctor's excuse from the emergency room, a form entitled "Work/School Statement," states:

Cole, Jacquelin was seen by Dr. Hood @ 0504 hr. on 1/24/03

. . .

Will require time off from work/school.  Return 1/27/03.

9

(*Id.*, ex. 8.)  The form does not indicate any diagnosis or a prescribed course of treatment. (*See id.*)  Also, plaintiff did not testify or otherwise present evidence that Dr. Hood had prescribed a course of treatment or that she was incapacitated for the entire weekend.

Plaintiff returned to work on January 28, 2003.  (*Id.* at 174.)  When she returned, she handed Dailey the Work/School Statement and told her that she was leaving at 1:00 p.m. for a previously-scheduled checkup.  (*Id.*, Ex. 2 at 102 and ex. 18.)  Plaintiff testified that the following occurred when she returned to work on January 28, 2003 –

> When [Dailey] came over to me to my desk, she said, "Well, how are you feeling, Jacqueline?"  And I told her, "I'm feeling fine, you know, but today is my regular checkup.  I'm scheduled to work half a day today, I have a doctor's appointment for my annual checkup."  She told me, "Well, I don't know about [that] with all the time you've been off, you know."  And like I told her, I can't control my sickness, nobody can.  And so she told me, "Well, I'll have to see."
>
> . . .
>
> She told me she will have to see, but I told her I was going whether she saw or not, because that was my appointment.

(*Id.*, Ex. 1 at 173.)  Dailey testified that she did not tell plaintiff that she could not leave work; however, she did "warn[ ] her that she was way behind."  (*Id.*, Ex. 2 at 102.)

Plaintiff went to her doctor's appointment.  (*Id.*, Ex. 1 at 176.)  According to Dailey, that afternoon she and Branham decided that plaintiff should be terminated.  (*Id.*, Ex. 4 ¶ 11; *see also id.*, Ex. 3 at 44.)  Branham must approve any termination decision in her area.  (*Id.*, Ex. 3 at 23.)  Dailey and Branham decided that plaintiff should be terminated; however, Branham wanted Lauren Higginbotham in Human Resources, to look at Dailey's

10

documentation before actually terminating plaintiff.    (*Id.* at 24, 44; *id.*, Ex. 4 ¶ 11.)

Higginbotham's approval was not required; Branham testified –

> Q.  If Lauren Higginbotham had said don't fire [plaintiff], would that
> have prevented you from firing her?
>
> A.  No.

(*Id.*, Ex. 3 at 42.)

The following day, January 29, 2003, Higginbotham told Dailey to go ahead and fire

plaintiff, but Higginbotham wanted to talk to Branham "to make sure that [Dailey] had

[Branham's] agreement." (*Id.* at 25-26.)[4]  Branham, however, was out of the office until

January 31, 2003. (*See id.* at 26.)

Plaintiff returned to work on January 29, but she left early to have an MRI.  (*Id.*, Ex.

1 at 176-78.)  On January 30, plaintiff gave Dailey a doctor's excuse for January 29 and a

letter from her doctor, which stated that she needed to be off for surgery on February 4, 2003.

(*Id.* at 179-80 and exs. 11, 12; *id.*, Ex. 2 at 104-05 and exs. 17, 19.)

On January 31, 2003, when Branham returned, Dailey told her about plaintiff's need

for surgery. (*Id.*, Ex. 2 at 118; *id.*, Ex. 3 at 42.)  Dailey also told Higginbotham about "the

time [plaintiff] has missed [and] the [surgery]." (*Id.*, Ex. 2, Ex. 16 at HS000079; *see also id.*,

Ex. 3 at 37.)  Branham talked with Higginbotham and, later in the afternoon of January 31,

---

[4]Dailey's notes state, "[Higginbotham] ask[ed] does [Branham] agree [with] this
[decision];" Dailey told her Branham did; and Higginbotham said she wanted "to hear from
[Branham] we can let her go." (Doc. 18, Ex. 2, ex. 16 at HS000077.)

2003, Branham and Dailey told plaintiff that she was fired.  (*Id.*, Ex. 1 at 187-88; *id.*, Ex. 3 at 26.)

## III.  DISCUSSION

There are basically two types of FMLA claims: one based on the employer's denial of or interference with the employee's substantive rights under the FMLA, and the other based on the employer's discrimination or retaliation against the employee for engaging in activity under the FMLA.  The Seventh Circuit Court of Appeals has described the two types of claims as follows:

> First, the FMLA contains prescriptive protections that are expressed as substantive statutory rights.  The Act provides eligible employees of a covered employer the right to take unpaid leave for a period of up to twelve work weeks in any twelve-month period for a serious health condition as defined by the Act.  29 U.S.C. § 2612(a)(1).  After the period of qualified leave expires, the employee is entitled to be reinstated to the former position or an equivalent one with the same benefits and terms of employment that existed prior to the exercise of the leave.  29 U.S.C. § 2614(a).  To insure the availability of these guarantees, the FMLA declares it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided."  29 U.S.C. § 2615(a)(1).

> When an employee alleges a deprivation of these substantive guarantees, the employee must demonstrate by a preponderance of the evidence only entitlement to the disputed leave.  In such cases, the intent of the employer is immaterial.  *See Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir.1997) ("We shall continue to resolve suits under the FMLA . . . by asking whether the plaintiff has established, by a preponderance of the evidence, that he is entitled to the benefit he claims."); *see also Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir.1998)("Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer.").

> In addition to the substantive guarantees contemplated by the Act, the FMLA also affords employees protection in the event they are discriminated

12

against for exercising their rights under the Act. *See* 29 U.S.C. § 2615(a)(1) & (2). Specifically, "[a]n employer is prohibited from discriminating against employees . . . who have used FMLA leave." 29 C.F.R. § 825.220(c). Furthermore, an employer may not consider the taking of FMLA leave as a negative factor in employment actions. *Id.* Because the FMLA's implementing regulations bar certain discriminatory conduct, the protections contemplated by these sections have been characterized as proscriptive in nature. *See Hodgens*, 144 F.3d at 160.

In contrast to what an employee must show to establish a deprivation of a substantive guarantee under the Act, when an employee raises the issue of whether the employer discriminated against an employee by taking adverse action against the employee for having exercised an FMLA right, the question of intent is relevant. The issue becomes whether the employer's actions were motivated by an impermissible retaliatory or discriminatory animus. *Id.* ("In such a case, the employer's motive is relevant, and the issue is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason.").

*King v. Preferred Technical Group*, 166 F.3d 887, 891(7th Cir. 1999). Plaintiff alleges both types of FMLA claims based on her termination. Defendant argues, *inter alia*, that plaintiff cannot establish either an interference claim or a retaliation claim because plaintiff cannot prove that she had a "serious health condition," and also because the decision to terminate her was made before she notified defendant on January 30, 2003, of her need for medical leave beginning February 4, 2003.

## A. "SERIOUS HEALTH CONDITION"

Defendant contends that plaintiff cannot establish that she had a qualifying "serious health condition" pursuant to the FMLA; therefore, it contends her FMLA claims are due to be dismissed. The purpose of the FMLA is "'to balance the demands of the workplace with the needs of families' by ensuring the availability of 'reasonable leave' for employees who

13

need time for health or family reasons." *Smith v. BellSouth Telecommunications, Inc.*, 273 F.3d 1303, 1313 (11th Cir. 2001)(quoting 29 U.S.C. § 2601(b)(1)-(2)).  The Act entitles an eligible employee to take up to twelve workweeks of unpaid leave because of a "***serious health condition***" that makes her unable to perform the functions of her position.  29 U.S.C. § 2612; 29 C.F.R. § 825.112.  The regulations' define "serious health condition" to include an illness that involves "***continuing treatment by a health care provider***," which, in turn, is defined as:

> (2) Continuing treatment by a health care provider.  A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:

> (i) "[a] ***period of incapacity*** (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of ***more than three consecutive calendar days*** . . . that ***also*** involves:

> . . .

> (B)  ***Treatment by a health care provider*** on at least one occasion which results in a ***regimen of continuing treatment*** under the supervision of the health care provider.

14

29 C.F.R. § 825.114(a)(2)(i)(B) (emphasis added).[5] *"Treatment by a health care provider"*

---

[5]Section 825.114 also defines a "serious health condition to include "an illness, injury, impairment, or physical or mental condition that involves:

(1) Inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity (for purposes of this section, defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom), or any subsequent treatment in connection with such inpatient care; or

(2) Continuing treatment by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:

(i) A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

(ii) Any period of incapacity due to pregnancy, or for prenatal care.

(iii) Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:

(A) Requires periodic visits for treatment by a health care

15

provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

(B) Continues over an extended period of time (including recurring episodes of a single underlying condition); and

(C) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

(iv) A period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider. Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.

(v) Any period of absence to receive multiple treatments (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for restorative surgery after an accident or other injury, or for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), kidney disease (dialysis).

29 CFR § 825.114(a).  A "serious health condition" does not include:

Conditions for which cosmetic treatments are administered (such as most treatments for acne or plastic surgery) . . . unless inpatient hospital care is required or unless complications develop. Ordinarily, unless complications arise, the common cold, the flu, ear aches, upset stomach, minor ulcers, headaches other than migraine, routine dental or orthodontia problems, periodontal disease, etc., are examples of conditions that do not meet the definition of a serious health condition and do not qualify for FMLA leave. Restorative dental or plastic surgery after an injury or removal of cancerous growths are serious health conditions provided all the other conditions of this regulation are met.  Mental illness resulting from stress or allergies may be serious health conditions, but only if all the conditions of this section are met.

includes "examinations to determine if a serious health condition exists and evaluations of the condition," and "a ***regimen of continuing treatment*** includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition (e.g., oxygen)." *Id.* § 825.114(b) (emphasis added).

Plaintiff alleges she had two serious health conditions – strep throat, which kept her off work from January 24th through January 27th, and a cyst of her ovary, which required surgical removal and several days of bed rest. (*See* doc. 1, ¶¶ 7-8, 9; doc. 18, Ex. 1 at 183-84.)

Defendant argues that plaintiff's bout of strep throat was not a serious health condition. Plaintiff disagrees. She argues:

> Plaintiff did not work on January 24th because she was off sick. She called in sick on the 27th. . . . Exhibit 8 [to plaintiff's deposition] shows that Plaintiff was in the <u>hospital</u> for strep throat and presented a doctor's excuse returning her to work on the 28th. This shows she was both hospitalized[6] and that she was sick for more than three consecutive days (January 24, 25, 26, 27) for a condition which required her to go to the emergency room and that incapacitated her for three or more days. As a result, under *Russell* [*v. North Broward Hospital*, 346 F.3d 1335 (11th Cir. 2003)] and 29 C.F.R. § 825.114, she suffered a serious health condition on that occasion.

(Doc. 20 at 20 (emphasis in original; footnote added).) Plaintiff testified that she was seen in the emergency room on the morning of Friday, January 24, 2003. (Doc. 18, Ex. 1 at 170.)

---

*Id.* (c).

[6]In order to qualify as a "serious medical condition" based on plaintiff hospital stay, such stay must have been "[i]n-patient (i.e., an overnight stay) in a hospital." 29 C.F.R. § 825.114(a)(1).

She testified that she was diagnosed with strep throat and given a "Work/School Statement" that said she had been seen in the emergency room and that she would return to work on Monday, January 27, 2003. (*Id*. at 168, 170-71, and ex. 8.) On Monday, January 27, 2003, plaintiff was still "under the weather" and called in sick to work; she returned to work on January 28, 2003. (*Id*. at 171.)

In order to establish a "serious health condition" pursuant to 29 C.F.R. § 825.114(a)(2)(i)(B), plaintiff must establish that she was incapacitated for more than three days *and* she was treated on one or more occasions by a health care provider that prescribed a regime of continuing treatment. The court assumes that plaintiff can prove that she was incapacitated for "more than three consecutive calendar days." However, nothing in the record indicates that plaintiff received a "regimen of continuing treatment under the supervision of the health care provider" as defined by the regulations. *See id*. "Under paragraph (a)(2)(i)(B), a regimen of continuing treatment includes  . . . a course of prescription medication  . . . or therapy . . . ." 29 C.F.R. § 825.114(b). "A regimen of continuing treatment," however, does not include instructions to take over-the-counter medication or "other similar activities that can be initiated without a visit to a health care provider." *Id*.

Plaintiff has not submitted any evidence that the health care provider prescribed her a "regimen of continuing treatment" for her strep throat; therefore, the court finds plaintiff has not submitted substantial evidence that her bout of strep throat was a serious health condition under the FMLA.

18

Therefore, defendant's Motion for Summary Judgment based on an alleged lack of a serious health condition will be granted to the extent plaintiff's claims are based on the leave occasioned by her bout of strep throat, which plaintiff has not demonstrated was a serious health condition. For purposes of summary judgment, however, the court assumes plaintiff can establish that her ovarian cyst was a serious health condition.

## B. TIMING OF DEFENDANT'S DECISION TO TERMINATE

Defendant contends that plaintiff's interference and retaliation claims based on her termination are due to be denied because it decided to terminate plaintiff before she notified defendant of her need for FMLA leave beginning February 4, 2003.

As set forth above, Dailey and Branham testified that they decided to terminate plaintiff on January 28, 2003. Higginbotham, at Branham's request, reviewed the documentation regarding plaintiff's work problems, and on January 29, 2003, she approved the decision to terminate plaintiff, subject to verification from Branham that she had approved of the decision to terminate. Plaintiff gave Dailey notice of her request for leave on January 30, 2003. Branham and Higginbotham, through Dailey, were aware of plaintiff's leave request before Dailey and Branham told plaintiff that she was terminated.

### 1. Retaliation Claim

The *McDonnell Douglas* tripartite, burden shifting analysis applies to claims of discrimination and retaliation in violation of FMLA. *See Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000). "To state a claim under the FMLA, a plaintiff must show that: (1) she availed herself of a protected right; (2) she suffered an adverse employment decision;

19

and (3) there is a causal connection between the protected activity and the adverse employment decision." *Id.* (citations omitted).

To prove a causal connection, "the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)(citing *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997)), *cert. denied* 532 U.S. 1037 (2001). "That requirement rests upon common sense. A decision maker cannot have been motivated to retaliate by something unknown to him." *Id.* Also, plaintiff cannot establish a causal connection between an adverse employment action and her request for leave when, as in this case, defendant first had notice of her request for leave *after* it had begun "contemplating" the adverse employment action at issue. *See Clark County School District v. Breeden*, 532 U.S. 268, 272 (2001)(per curiam). In *Breeden*, the Supreme Court held:

> The Court of Appeals reversed, relying on two facts: The EEOC had issued a right-to-sue letter to respondent three months before Rice announced she was contemplating the transfer, and the actual transfer occurred one month after Rice learned of respondent's suit. The latter fact is ***immaterial*** in light of the fact that petitioner concededly was ***contemplating*** the transfer ***before*** it learned of the suit. Employers need not suspend previously planned [adverse employment actions] upon discovering [protected activity], and ***their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality***.

*Id.* (emphasis added and internal citations omitted).

Therefore, because defendant has presented undisputed evidence that it "contemplated" plaintiff's termination ***before*** plaintiff notified it of her need for FMLA

20

leave, plaintiff cannot establish a causal connection between her termination on January 31,

2003, and her request for FMLA leave given to Dailey on January 30, 2003. Therefore,

plaintiff's retaliation claim will be dismissed.

### 2. Interference Claim

"To state a claim of interference with a substantive [FMLA] right, an employee need

only demonstrate by a preponderance of the evidence that [s]he was entitled to the benefit

denied." *Strickland v. Water Works and Sewer Bd.*, 239 F.3d 1199, 1206-07 (11th Cir.

2001)(citing *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1353-54 (11th Cir.

2000); *King*, 166 F.3d at 891). "The issue [in an FMLA interference claim] is simply

whether the employer provided its employee the entitlements set forth in the FMLA . . . .

Because the issue is the right to an entitlement, the employee is due the benefit if the

statutory requirements are satisfied, regardless of the intent of the employer." *Hodgens v.*

*General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998)(internal citations and quotations

omitted). The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny

the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C.

2615(a)(1). The FMLA creates two primary rights – (1) the right to a leave of absence for

a qualifying purpose, and (2) right to reinstatement upon return from such leave. Plaintiff

claims she was denied the right to a leave of absence because defendant terminated her on

January 31, 2003, before her qualifying leave, which was set to begin on February 4, 2003.

Section 2612(a)(1) provides:

21

> Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:
>
> . . .
>
> (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612(a)(1)(D). "To be eligible for FMLA benefits, one must at a minimum be an 'employee,' not a 'recently terminated employee.' . . . A termination decision makes one ineligible for FMLA benefits . . . ." *Dvorak v. Mostardi Platt Associates, Inc.*, 289 F.3d 479, 486 (7th Cir. 2002)(citing 29 U.S.C. § 2612(a)(1); *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir. 1998)); *see also Brohm*, 149 F.3d at 523 ("Brohm was not an 'eligible employee' at the time he received medical attention for his condition.  He had already been terminated a week earlier.").  Plaintiff was not an "employee" at the time of her qualified leave on February 4, 2003, because defendant already had terminated her on January 31, 2003.  Therefore, she cannot established that she was an "eligible employee" entitled to leave.

Because plaintiff cannot establish she was an eligible employee, the court finds that defendant did not deny her a leave of absence to which she was entitled under the FMLA.  Therefore, plaintiff's interference FMLA claim will be dismissed.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that plaintiff's Motion to Strike is due to be granted in part and denied in part.  Plaintiff's Motion to Strike will be granted as to the declaration of Brown and Clemon; such evidence has not been considered by the court.  Plaintiff's Motion to Strike will be denied as to paragraph 16 of Dailey's declaration.  Also, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law.  An order granting defendant's motion for summary judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE** this _24th_ day of September, 2004.

*Sharon Lovelace Blackburn*

**SHARON LOVELACE BLACKBURN**
United States District Judge